**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

In re:

STURGIS IRON & METAL CO., INC.,                Case No. HK 08-02966

      Debtor.

_____/

**OPINION RE: FIFTH THIRD LEASING'S AUGUST 22, 2008 MOTION**

Appearances:

Richard E. Kruger, Esq., Detroit, Michigan, attorney for the Debtor
Robert H. Skilton, Esq., Grand Rapids, Michigan, attorney for Fifth Third Leasing Co.
Aaron M. Silver, Esq., Detroit, Michigan, attorney for the Official Committee of Unsecured
      Creditors
Dean E. Rietberg, Esq., Grand Rapids, Michigan, attorney for the United States Trustee

The SEET Connecticut Statutory Trust ("SEET Connecticut") has a commercial equipment lease with Sturgis Iron & Metal Co. ("Debtor"). Fifth Third Leasing Company ("Fifth Third") is the trust's servicing agent. Fifth Third requests, over the Committee's objection, the allowance of an administrative claim for rents and taxes owed on account of that lease.

**BACKGROUND**

Debtor recycled metal from scrapped vehicles. The equipment it used to process the vehicles included the shredder it leased from SEET Connecticut. That shredder, which is large enough to accommodate a school bus, is still located at Debtor's Indiana facility.

Debtor filed for Chapter 11 relief on April 4, 2008. Debtor intended from the outset to liquidate its operations and, in fact, it rejected the lease with Connecticut SEET by June of that same year. Nonetheless, two payments for rent had accrued prior to the lease's rejection and, as a

consequence, Fifth Third demands that it be allowed as administrative rent the $404,120.16 that had accrued. The Committee opposes the request, arguing instead that Fifth Third is entitled to at most a nominal amount because the estate used the shredder little, if at all, postpetition.

Fifth Third also asks that it be allowed an administrative expense for 2008 property taxes associated with the shredder. Fifth Third calculates that the Debtor's pro rata share is $40,312.56. However, the Committee argues that the estate owes Fifth Third nothing because the lease had been rejected well before Debtor had any obligation to account for the taxes due.

## DISCUSSION

**A.**  **Is Fifth Third Entitled To Receive As Administrative Rent Under Section 503(b)(1)(A)[1] The Two Postpetition Monthly Payments That Came Due Under The Lease Before Debtor Rejected It?**

**1.**  Logic and the Plain Meaning of Section 503(b)(1)(A)

It would appear at first glance that the Committee comes to this battle aboard a dreadnought while Fifth Third approaches on an open raft.[2] After all, the position the Committee advocates - that a lessor's claim for administrative rent is to be limited to only that which reflects the estate's actual use of the property demised - is supported by no less than 34 cases gathered from what the Committee accurately describes as "myriad" others. In contrast, Fifth Third has managed to muster only a single decision: *In re Palace Quality Services, Inc.*[3]

---

[1]11 U.S.C. § 503(b)(1)(A). Unless otherwise designated, all further references to "Section ___," "Bankruptcy Code," or "Code" shall be to the Bankruptcy Code as currently amended. 11 U.S.C. §§ 101, *et seq.*

[2]H.L. Mencken.

[3]283 B.R. 868 (Bankr. E.D. Mich. 2002).

2

However, Fifth Third does enjoy the singular advantage of the undersigned being both the author of *Palace Quality* and this opinion.[4] Fifth Third also has the benefit of logic and the English language, for both call into question the position the Committee advocates. Perhaps the law tolerates inconsistencies better than either science or mathematics. Nonetheless, the law, and in particular, codes, require at the very least that there be harmony between the rule espoused and the underlying concepts from which that rule is derived.

The Committee's problem is simply that the "well established" rule it cites falls short of this standard. To begin, executory contracts and unexpired leases are not, as the Committee would have it, interchangeable. An executory contract, to use Professor Countryman's definition, is:

> [a] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

*Terrell v. Albaugh*, 892 F.2d 469, 471, n. 2 (6th Cir. 1989) (quoting from Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).[5]

For example, A's agreement to sell Blackacre to B in exchange for $10,000 is an executory contract because A's obligation to deliver the deed to Blackacre as promised would be excused if B reneged on his promise to pay just as B's obligation to pay $10,000 would be excused if A reneged on his promise to deliver Blackacre.

---

[4]The undersigned wrote *Palace Quality* while assigned as a visiting judge to the Eastern District of Michigan.

[5]*See also, N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 522, n. 6, 104 S.Ct. 1188, 1194 (1984) (holding that an executory contract is one on which performance is due to some extent on both sides).

3

A textbook lease does not fit this definition.[6]  A lease may still be unperformed from the tenant's perspective because of his promise to pay periodic rent over the lease's term.[7]  However, there typically is no corresponding unperformed promise on the part of the landlord because his commitment to turnover possession of the subject property would have been fulfilled at the outset of the lease.[8]  Indeed, a landlord's relationship with his tenant is more akin to an estoppel. The law, in other words, estops a landlord from retaking possession of what otherwise rightfully belongs to him only because the landlord agreed to relinquish possession of his property in the first place. The law equally recognizes, though, that this relinquishment of possession is itself a function of conditions the landlord also imposed, such as the tenant's timely payment of a specified rent. As a consequence, the landlord can be kept at bay only so long as these conditions are being met. This

---

[6]     **Lease**. Any agreement which gives rise to relationship of landlord and tenant (real property) or lessor and lessee (real or personal property). A contract for exclusive possession of lands, tenements or hereditaments for life, for term of years, at will, or for any interest less than that of lessor, usually for a specified rent or compensation. Contract wherein one lets to the other a certain space, property or building for specified unit of time, generally a week, month or year. Agreement under which owner gives up possession and use of his property for valuable consideration and for definite term and at end of term owner has absolute right to retake, control and use property.

BLACK'S LAW DICTIONARY 889 (6th ed.1991) (citations omitted).

[7]Of course, if the tenant paid all of the agreed upon rent at the outset of the term, then even this executory element of the unexpired lease would be absent.

[8]Leases can, of course, include a lessor's executory promises as well. For example, a landlord may promise to insure the premises, pay applicable taxes, or plow the parking lot. Indeed, the Bankruptcy Code itself addresses the circumstances under which the estate, as the debtor's successor to the leasehold interest, may compel the lessor to perform these ancillary promises. 11 U.S.C. § 365(b)(4). However, a lease may also be devoid of such promises, as is exemplified by what is often referred to as a triple-net lease - i.e., a lease where insurance, taxes and maintenance are all the tenant's responsibility. In fact, the lease agreement in this instance describes itself as a "net lease" with "all costs, expenses and liability associated with the Equipment or its lease [to] be borne by Lessee." ¶ 4, Master Equipment Lease Agreement, attached as Ex. A to Fifth Third/SEET Connecticut's August 22, 2008 Motion.

4

is the reason why legal scholars describe a lease as property *cum onere* - i.e., property with a burden.

*Palmer v. Palmer*, 104 F.2d 161, 163 (2nd Cir. 1939) and BLACKS LAW DICTIONARY (6th ed. 1990).[9]

However, as burdened as the tenant's right to possess the landlord's property may be, it is

nonetheless clear from the Bankruptcy Code's legislative history that this right, or better, leasehold,

is still a property interest under Section 541.

> This section [Section 541] defines property of the estate, and specifies
> what property becomes property of the estate. The commencement
> of a bankruptcy case creates an estate. Under paragraph (1) of
> subsection (a), the estate is comprised of all legal or equitable interest
> of the debtor in property, whenever located, as of the commencement
> of the case. The scope of this paragraph is broad. It includes all
> kinds of property, including tangible or intangible property, causes of
> action (see Bankruptcy Act § 70a(6)), and all other forms of property
> currently specified in section 70a of the Bankruptcy Act § 70a, as
> well as property recovered by the trustee under section 542 of
> proposed title 11, if the property recovered was merely out of the
> possession of the debtor, yet remained "property of the debtor." **The
> debtor's interest in property also includes "title" to property,**

---

[9]    A key characteristic of this [a landlord/tenant] relationship is that the
lessee's rights in the property **derive** from those of the lessor. The lessor
always retains ownership of the property which is subject to the lease,
whether the property is real estate, an automobile, or something else.
Whatever right the lessee has to use that property is dictated by the terms
of the agreement reached with the lessor. A lessee may continue to use the
subject property to the exclusion of the lessor only for so long as the lessee
pays the agreed rent and otherwise complies with the terms of the lease. If
the lessee defaults, then the lessor has the right to regain possession of the
subject property. The lessor can regain possession either through the
lessee's voluntary abandonment of the leasehold interest or through legal
process. Either way, the recovery of possession results in the resurrection
of the lessor's undivided interest in the subject property which had existed
prior to its grant of the leasehold interest to the lessee.

*Palace Quality*, 283 B.R. at 879-80 (emphasis in original).

5

> **which is an interest, just as are a possessory interest, or leasehold interest, for example.**

H.R. Rep. No. 95-595, at 367 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323; S. Rep. No. 95-989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868 (emphasis added).[10]

As such, a leasehold, like all other interests of the debtor, immediately becomes property of the estate whenever bankruptcy relief is sought.[11]

But the burdened nature of the leasehold acquired also calls into play a fundamental precept of bankruptcy law – that the estate can gain no greater right under the leasehold than had the debtor

---

[10] *See also, Triad International Maintenance Corp. v. Southern Air Transport, Inc. (In re Southern Air Transport, Inc.)*, 511 F.3d 526, 533-34 (6th Cir. 2007) ("It follows that SAT's right under the lease to exclusively possess the aircraft constituted property of the estate under 11 U.S.C. § 541(a)(1)."); *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 430 (2nd Cir. 1987)("The courts are in agreement that unexpired leasehold interests . . . constitute property of the bankrupt estate."); *Arizona Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Arizona Appetito's Stores, Inc.)*, 893 F.2d 216, 218 (9th Cir. 1990) ("A leasehold is property of the estate if a debtor is the lessee of the property at the time the petition for bankruptcy is filed."); *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3rd Cir. 2001); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 300 (3rd Cir. 2000); *Brattleboro Hous. Auth. v. Stoltz (In re Stoltz)*, 197 F.3d 625, 629 (2nd Cir. 1999); *In re Am. Int'l Airways, Inc.*, 44 B.R. 143, 145 (Bankr.E.D.Pa.1984); *In re KDT Indus., Inc.*, 32 B.R. 852, 856 (Bankr.S.D.N.Y.1983); *In re Babco, Inc.*, 28 B.R. 656, 657-58 (W.D.Pa.1983); *In re Allan Steaks Corp.*, 22 B.R. 881, 882 (Bankr.D.Mass.1982); *In re Andorra Meat Mkt., Inc.*, 7 B.R. 744, 745-46 (Bankr.E.D.Pa.1980); *In re Nw. Recreational Activities*, 4 B.R. 36, 43 (Bankr. N.D.Ga.1980). *See also,* "Comparative Analysis" and "The Bankruptcy Code," *infra*.

[11] 11 U.S.C. § 541(a)(1) ("The commencement of a case . . . creates an estate" and "[s]uch estate is comprised of . . . all legal and equitable interests of the debtor as of the commencement of the case."). *See, though, In re Attorneys Office Management, Inc.*, 29 B.R. 96 (Bankr. C.D. Cal. 1983). In that case, the court declared that the estate did not take "title" to a lease unless and until it was assumed notwithstanding that court's recognition that the bankruptcy estate had already acquired some type of interest in the leased property at the case's inception. *Id.* at 98-99. Unfortunately, the court did not offer either case authority or, even more important, a rationale to support this conclusion. Moreover, *AOM*'s reference to the estate acquiring something beyond what it already had acquired at the outset of the case is confusing, especially when the court also in its opinion referred to the landlord's own "reserved title" in the subject property. In other words, if, as the court in *AOM* recognizes, the estate acquired some interest in the leased property at the outset of the case, and if, as that court also acknowledges, the lessor itself continues to hold the "reserved title," one must ask what exactly is the "title" that supposedly is to be added to the estate's property rights should the estate also decide to assume the lease at some later date.

6

previously enjoyed unless the Bankruptcy Code itself creates that greater right. As the Supreme

Court itself observed:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 918 (1979).[12]

And the Sixth Circuit has likewise stated:

> Under 11 U.S.C. § 541, the trustee succeeds only to the title and rights in property that the debtor had and takes the property subject to the same restrictions that existed at the time the debtor filed the petition. Thus, a debtor's rights may not be expanded beyond what they were at the commencement of the case.

*Demczyk v. Mutual Life Ins. Co. of New York (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997) (citations omitted). *See also, In re Cook*, 457 F.3d 561, 566 (6th Cir. 2006) and *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 443-44 (6th Cir. 2003).[13]

How, then, does this rule apply when the interest acquired at the outset of the case is a

burdened asset like an executory contract or an unexpired lease? The Committee contends that

---

[12]In a much earlier opinion the Supreme Court expressed the same sentiment, albeit in a quainter fashion. "Under the present bankruptcy act, the trustee takes the property of the bankrupt . . . in the same plight and condition that the bankrupt himself held it. . . ." *Thompson v. Fairbanks*, 196 U.S. 516, 526, 25 S.Ct. 306, 310 (1905).

[13]The legislative history also echos this concept.

> Though this paragraph [Section 541(a)] will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

H.R. Rep. No. 95-595, at 367-68 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323; S. Rep. No. 95-989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868.

7

bankruptcy in fact overrides the normal relationship between the parties through its suspension of the nondebtor's right to demand further performance under the executory contract or lease until the estate makes its own decision under Section 365 to assume or reject the same. The Committee, though, can point to no provision within Section 365 itself that includes such a prohibition.[14]

Indeed, what Section 365 actually offers to the trustee is the ability to suspend the estate's own performance under a lease or contract yet still avoid the consequences of any resulting default should it later elect to assume the same. Take, for example, a debtor who supplies parts to a third party pursuant to a requirements contract. If that debtor were to file for Chapter 11 relief, it could decide as debtor-in-possession to temporarily halt postpetition deliveries in order to assess whether it was in the estate's interest to continue with that contract or not. If, after reflection, the debtor decided to assume the contract, then it could in effect regain its right to resume deliveries and to receive payment for the same so long as the debtor was able to cure the estate's previous default and otherwise comply with the requirements of Section 365(b). Or the debtor, as debtor-in-possession, could ultimately decide to reject the executory contract with the equal assurance that whatever damages should arise

---

[14]Nor is there any reason why Section 365 should include such a provision, since specific performance is seldom available as a remedy, and when it is (e.g., when real estate is involved), the stay imposed by Section 362(a)(3) provides the needed protection. Consider, for instance, what happens when the debtor files his case after agreeing to sell property but before actually closing the sale. Although non-bankruptcy law would typically permit the purchaser to compel performance in lieu of receiving damages had the debtor not filed for bankruptcy relief, the automatic stay would keep the purchaser at bay until the trustee had had sufficient time to decide whether to reject the contract. If the trustee were then to reject it, that rejection would excuse the estate from what otherwise had been its obligation under state law to specifically deliver the deed as had been promised. Conversely, if the trustee were at that time to assume the contract, then the trustee could continue to demand the promised payment from the contract's buyer provided the requirements of Section 365(b) had otherwise been met. Or, to express these concepts as the Committee has fashioned them, the estate, as the debtor/seller's assignee, would have the right to enforce the contract against the buyer while the buyer would not have the reciprocal right to enforce the same contract against the estate. *But, compare*, Section 365(i), where, by operation of the Bankruptcy Code itself, a land contract vendee who is in possession can still compel from the estate performance of the underlying land contract.

from its decision to reject will be treated nonetheless as a prepetition indebtedness.  11 U.S.C. § 502(g)(1).

That Section 365 provides this opportunity to the estate does not mean, however, that the other party to the contract or lease must stand idly by in the interim.  To the contrary, *Butner*'s and *Graham Square*'s neutral transfer rule[15] compels the conclusion that the other party may continue with its own rights and remedies unless some other Code section restricts the same.  For instance, this court determined in *In re Lucre*[16] that the nondebtor party to an executory contract may legitimately refuse postpetition performance under that contract notwithstanding Section 365 if the estate, as the debtor's successor-in-interest, is itself in material breach of the same contract.[17]

---

[15]      The effect of the Section 541(a)(1) **transfer** is **neutral**. The newly created estate receives no more or no less under Section 541(a)(1) than what the debtor had to transfer.

*Palace Quality*, 283 B.R. at 880 (emphasis in original).

[16]339 B.R. 648 (Bankr. W.D. Mich. 2006).

[17]The Committee contends that *Lucre* is inconsistent given that *Lucre* itself acknowledges that a trustee may enforce an executory contract prior to its assumption or rejection whereas the nondebtor party may not. *See*, Committee Brief, pp. 14-15, quoting from *Lucre*, 339 B.R. at 660, n. 12.  However, there is no inconsistency, for all things being equal, a debtor-in-possession can demand the other contracting party's performance whereas the debtor-in-possession, because of Section 365(b), can always refuse performance with the assurance that it can later cure that default and regain what otherwise would have been lost had only the law of contract applied. All that *Lucre* adds is simply this - that while the debtor-in-possession may be able to continue insisting upon the other contracting party's performance, the neutral transfer rule still leaves the other party with the option to refuse if the estate, as the debtor's successor, is itself in material default under that contract.  Or, to put it differently, under applicable non-bankruptcy law, an estate in default can have no greater right to demand performance from the other contracting party than had the debtor unless and until the estate takes advantage of the cure provisions that are provided in conjunction with the contract's assumption under Section 365.

Nor is this concept any different in connection with unexpired leases. What has changed is only that the landlord's performance is no longer executory because possession of the promised property has, by definition, already been relinquished. Granted, the landlord is no more able to force the estate to pay rent than is the nondebtor party to an executory contract able to compel the estate to perform what was promised of it. But the landlord is no less within its rights under the lease to seek possession once again of the demised

A lessor, of course, could not respond in the same fashion since the lessor would have already performed his obligation (*i.e.*, the delivery of the leased property) at the outset of the relationship. However, if his tenant does not pay the rent as agreed, the lessor would most certainly have the right to recover what, after all, is his property. Moreover, it follows under *Butner* and *Graham Square* that the lessor would also have that same right to recover against any succeeding bankruptcy estate should it not pay the rent.[18]   Or, as Judge Learned Hand said years ago in *Palmer*:

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry. While such ad interim payments need not, and of course would not, constitute an adoption of the term, insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; **and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee.**

104 F.2d at 163 (emphasis added).[19]

---

premises if the estate fails to pay rent than is the nondebtor party to an executory contract within its rights to refuse performance if the estate, either as a successor or in its own right, is in breach of that contract.

[18]The lessor would, of course, still have to secure relief from the automatic stay before enforcing the remedy.  But the stay is only a constraint.  It does not, as the Committee seems to suggest, alter what otherwise are the lessor's legitimate rights under the lease that carryover to the estate as the debtor's successor in interest. *See*, "The Automatic Stay and Section 365(d)(5)," *infra* and "Section 503(b)(1)(A) and the *Piggly-Wiggly* Alternative," *infra*.

[19]Although not as eloquently stated, *Palace Quality* makes the same point:

> A leasehold interest which is acquired by the bankruptcy estate from the debtor is no less subject to this "neutral transfer" principle than any other property interest held by the debtor. If the debtor is obligated to pay an agreed rental fee as a condition to possessing property which is owned by the lessor, then the bankruptcy estate must also be subject to that same obligation as a condition to the estate's continued possession of that property. Otherwise, the bankruptcy estate would have rights in the leased property greater than those which the debtor had to transfer pursuant to Section 541(a)(1). Put simply, Section 541(a)(1) offers the trustee no

But, if Judge Hand's logic is sound, then what justifies the Committee's insistence that a lessor must forgo what is otherwise its due and accept instead as its administrative rent under Section 503(b)(1)(A) only that which is deemed fair under the circumstances? After all, Section 503(b)(1)(A) itself states that "there **shall** be allowed" as administrative expenses "the actual, necessary costs and expenses of **preserving the estate**" (emphasis added). The edges of what is meant by this language may be gray.[20] However, given that the bankruptcy estate now includes leasehold interests from the outset of the case, it is difficult to imagine a more actual or necessary expense of preserving that estate than the payment of the very rent that nonbankruptcy law clearly recognizes as an absolute condition to the estate's continued possession of the property leased.[21] Or, put differently, an estate cannot

---

> independent right to remain in possession of leased property acquired from the debtor. Whatever right the trustee has under Section 541(a)(1) must derive from the debtor. Therefore, the estate must be bound by the same lease terms as those which bound the debtor pre-petition.

283 B.R. 880-81. *See also, In re Frazin*, 183 F. 28, 31-32 (2nd Cir. 1910) ("Moreover, if the bankrupt be divested of his interest in the leasehold estate, and it be vested in the trustee immediately upon his appointment, it is difficult to see upon what theory he can escape its obligations pending its retransfer.").

[20]Although modern courts, including the Sixth Circuit, have embellished the "actual, necessary" language of Section 503(b)(1)(A) to require that there be a direct and substantial benefit to the estate as well (*see, e.g., Caradon Doors and Windows, Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 447 F.3d 461, 464 (6th Cir. 2006)), the "benefit" requirement has nonetheless been relaxed to permit *Reading Co. v. Brown*'s exception for postpetition negligence claims incidental to the estate's continued operation of the debtor's business. *See, e.g., Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 817 (6th Cir. 1997) ("To be sure, the *Reading* rationale allows administrative expense priority in the absence of a post-petition benefit to the estate.").

[21]*See also, Palace Quality*:

> Given that the payment of the agreed upon rent is the essence of the lessee's right to enjoy exclusive possession of property under a leasehold, the ineluctable conclusion is that post-petition rents under a leasehold interest which has become property of the estate are expenses necessarily incurred

maintain property *cum onere* – i.e., property with a burden – without the estate also enduring the burden imposed.

Indeed, given the Supreme Court's and the Sixth Circuit's repeated pronouncements that courts must respect a statute's plain meaning, it is fair to ask why any more consideration of the case law is even needed.

> We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54, 112 S.Ct. 1146 (1992) (citations omitted).[22]

However, this court would be remiss if it were to just ignore the multitude of contrary decisions the Committee has been able to amass. Therefore, it is appropriate to determine why all of these other courts have come to such a different conclusion.

2.    Case Law

(a)    Cited Decisions

The Committee extracts as leading authority for its position the following from *In re Braniff Airways*:

> If the trustee assumes the lease, the debtor's estate becomes liable for the full rent accruing under the terms of the lease. If the trustee

---

> by the estate to preserve that leasehold interest pending the trustee's decision to ultimately assume or reject the lease.

283 B.R. at 898.

[22]*See also, White v. Kentuckiana Livestock Market, Inc.*, 397 F.3d 420, 426 (6th Cir. 2005) ("Generally speaking, of course, '[t]he plain meaning of legislation should be conclusive, except in the rare instances in which the literal application of a statute will produce a result demonstratively at odds with the intentions of its drafters.'") (quoting from *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026 (1989)).

12

> ultimately rejects the lease, the debtor's estate is liable only for the reasonable value of its use and occupancy of the premises. . . . [I]f there is no benefit to the estate, the breach of an executory agreement or lease does not give rise to a claim for administrative expense, but only an unsecured breach of contract claim under section 502(g).

Committee Brief, p. 6 (quoting from 783 F.2d 1283,1285-86 (5th Cir. 1986)).

However, what is lacking in *Braniff Airways* and, for that matter, the rest of the cases the Committee has gathered, is independent analysis. Granted, each case cited offers its own accumulation of authoritative decisions. But as Lord Rutherford, the Nobel laureate and unabashed physicist, liked to point out, stamp collecting is not physics.

Moreover, with little exception, all of the cases relied upon can be traced back to decisions made under the former Bankruptcy Act. For instance, the Committee cites as a companion case *Thompson v. IFG Leasing Co.*:

> When a lease is ultimately rejected but its interim continuance was an actual and necessary cost and expense to the estate, the allowable administrative expense is valued not according to the terms of the lease but under an objective worth standard that measures the fair and reasonable value of the lease.

788 F.2d 560, 563 (9th Cir. 1988) (citations omitted).

13

But eight of the nine decisions relied upon in *Thompson* were Bankruptcy Act cases[23] and the ninth one, while certainly a Code case,[24] references yet three more pre-Code opinions.[25]

This criticism is equally applicable to the Supreme Court and Sixth Circuit cases cited by the Committee. The Court certainly said in *N.L.R.B. v. Bildisco and Bildisco* that "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." 465 U.S. 513, 531, 104 S.Ct. 1188, 1199 (1984). However, with all due respect, the Court provides no more insight than *Braniff* or *Thompson*; rather, it supports its statement simply by citing yet another vintage Act case, that being *Philadelphia Co. v. Dipple*, 312 U.S. 168, 61 S.Ct. 538 (1941). Moreover, *Bildisco* involved a collective bargaining agreement, which is an executory contract, not an unexpired lease.[26] Consequently, *Bildisco* never had to address the question Judge Hand's comment in *Palmer* prompts. That is, how can a bankruptcy estate whose rights in a leasehold derive solely from those of the debtor continue in possession of the demised

---

[23]*Hall v. Baldrian (In re Cochise College Park, Inc.)*, 703 F.2d 1339 (9th Cir. 1983) (Act case); *Nw. Mut. Life Ins. Co. v. Axton (In re Axton)*, 641 F.2d 1262 (9th Cir. 1981) (Act case); *S & W Holding Co. v. Kuriansky*, 317 F.2d 666 (2nd Cir. 1963); *120 Wall Assocs. v. Schilling* , 266 F.2d 548 (2nd Cir. 1959); *Mathews v. Butte Mach. Co.*, 286 F.801 (9th Cir. 1923); *Dayton Hydraulic Co. v. Felsenthall*, 116 F. 961 (6th Cir. 1902); *Brown v. Danning (In re Frederick Meats, Inc.)*, 483 F.2d 951 (9th Cir. 1973); *Don Allen Chevrolet, Inc. v. Foreman (In re First Research Corp.)*, 457 F.2d 331 (5th Cir. 1972).

[24]*Union Leasing Co. v. Peninsula Gunite, Inc. (In re Peninsula Gunite, Inc.)*, 24 B.R. 593 (9th Cir. BAP 1982).

[25]*In re Frederick Meats*, 483 F.2d 951 (9th Cir. 1973); *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2nd Cir. 1960); and *Don Allen Chevrolet, Inc. v. Foreman (In re First Research Corp.)*, 457 F.2d 331 (5th Cir. 1972).

[26]465 U.S. at 521-22.

premises for even a moment without also having to pay the rent upon which the leasehold is conditioned?

As for the Sixth Circuit, the Committee has cited the leading cases of *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir. 1987) and *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re United Trucking Service, Inc.)*, 851 F.2d 159 (6th Cir. 1988). But *White Motor* relies primarily upon the former Act case of *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st Cir. 1976) and *United Trucking* relies upon the even older case of *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2nd Cir. 1960).[27]

Moreover, neither *White Motor* nor *United Trucking* is on point since neither addresses the question of administrative rent on account of an unexpired lease. Like *Bildisco*, *White Motor* involved an executory contract, not an unexpired lease.[28] Indeed, *United Trucking* itself distinguished *White Motor* for exactly that reason.

> In contrast [to *White Motor*], this case involves a claim arising from United's post-petition continued use of leased equipment that was allegedly not in accordance with the terms of the pre-petition lease agreement. We therefore do not believe the key inquiry is on inducement as in *Mammoth Mart*, *Jartran*, and *White Motor*.

*United Trucking, Id.* at 162.

---

[27]*White Motor*, 831 F.2d at 110 and *United Trucking*, 851 F.2d at 162.

[28]The debtor in *White Motor* had contracted prepetition with Employee Transfer Corporation ("ETC") to provide relocation services for its transferred employees. ETC, at the employee's request, purchased the employee's home at an agreed upon price and then maintained the home until it could be re-sold. The debtor in turn would pay ETC for its services when finally billed, together with reimbursement for whatever direct costs ETC may have incurred. *Id.* at 107.

15

And while *United Trucking* did address claims arising from leases, the issues in that case were whether the lessor was entitled to an administrative claim for (1) damages done by the debtor-in-possession to the trailers postpetition, and (2) the loss of another trailer that had been stolen prepetition. Nothing was said in *United Trucking* about administrative rent.[29]

In summary, then, the overwhelming authority that the Committee has brought to bear against Fifth Third's claim for administrative rent rests for the most part upon case law decided prior to the Bankruptcy Code's enactment. Therefore, these earlier decisions need to be examined more closely.

      (b)    Pre-Code Authority

As ably explained by Professor Michael T. Andrew in *Executory Contracts in Bankruptcy: Understanding "Rejection,"*[30] much of what became the law concerning the treatment of executory contracts and unexpired leases under the former Bankruptcy Act can be traced back to the early 19th

---

[29]The Committee also cites as Sixth Circuit authority *Pension Benefit Guar. Corp. v. Sunarhauserman (In re Sunarhauserman, Inc.)*, 126 F.3d 811 (6th Cir. 1997); *Caradon Doors and Windows, Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 447 F.3d 461 (6th Cir. 2006); *City of White Plains, New York v. A & S Galleria Real Estate, Inc. (In re Federated Dept. Stores, Inc.)*, 270 F.3d 994 (6th Cir. 2001); and *Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.)*, 203 F.3d 986 (6th Cir. 2000). However, while *Sunarhauserman, Eagle-Picher* and *Federated* all addressed some aspect of Section 503(b)(1)(A) administrative priority, none of these cases involved either the allowance of administrative rent or the proration under a lease of yet to be billed taxes, which are the two issues at hand. As for *Koenig Sporting Goods*, it if anything favors this court's approach of awarding administrative rent based upon when that rent becomes due under the lease. But in any event, *Koenig Sporting Goods* was decided under Section 365(d)(3) as opposed to Section 503(b)(1)(A) and, therefore, is distinguishable. *Id.* at 989. *See, infra.*

[30]59 U. Colo. L. Rev. 845 (1988). Professor Andrew's article attempts to eliminate much of the confusion that surrounds the treatment of executory contracts and unexpired leases under the Bankruptcy Code. Key to his effort is his contention that the current law cannot be understood unless it is given historical perspective. Consequently, this court is grateful to Professor Andrew for his extensive research and thoughtful insights concerning that history. Unfortunately, this court does not agree with many of his conclusions as to how executory contracts and unexpired leases are now to be administered because Professor Andrew apparently did not believe that Congress eliminated the *Copeland* fiction in 1978.

16

century English case of *Copeland v. Stephens*.[31] Copeland was a lessor of real property and Stephens was his tenant. Stephens had also declared bankruptcy. Consequently, Stephens claimed that he did not owe any further rent to Copeland on the theory that the leasehold and its attendant obligation to pay rent had passed to his assignees along with the rest of his property under the bankruptcy laws.

The court disagreed, concluding instead that the assignees did not automatically take the leasehold interest upon the commencement of the bankruptcy case, but rather took the interest only if they in fact later accepted it through some manifest act.[32] In other words, it was up to the bankruptcy assignees to decide whether to be bound or not by the particular lease, and as a consequence, it remained Stephens' obligation to pay the post-filing rent to Copeland until such an acceptance was made, if ever.

The Committee dismisses *Copeland v. Stephens* as an anomaly of English case law that had no bearing upon the development of bankruptcy law under the former Act. Committee Brief, p. 17. Indeed, the Committee suggests that executory contracts and unexpired leases immediately became property of the estate under the Bankruptcy Act just as they now do under the Bankruptcy Code because of the similarity in language between Section 541 and its counterpart under the old Act, former Section 71a. *Id.* But the case law does not support this contention. For example, in *In re Frazin*, 183 F. 28 (2nd Cir. 1910), the court said:

> An adjudication in bankruptcy does not dissolve or terminate the contractual relations of the bankrupt * * * Its effect is to transfer to the

---

[31](1818) 106 Eng. Rep. 218 (K.B.).

[32]*Understanding "Rejection,"* 59 U. Colo. L. Rev. at 856-57.

17

> trustee all the property of the bankrupt except his executory contracts,
> and to vest in the trustee the option to assume or to renounce these.

*Id.* at 31 (quoting from *Watson v. Merrill*, 136 F. 359, 363 (8th Cir. 1905)).

*Frazin* then went on to add:

> In our opinion, upon principle and authority, a trustee, having the
> option to assume or reject a lease, takes title to such lease only in case
> he elects to accept it.  If he elects to accept it, then, by virtue of the
> provision of the bankruptcy act already quoted, the vesting of the title
> relates back to the date of adjudication.  But, if the trustee does not
> elect to accept the lease, it remains the property of the bankrupt.

*Id.* at 32.

Indeed, the Ninth Circuit, in deciding an Act case, said this as late as 1985:

> Because executory contracts and leases involve future liabilities as
> well as rights, however, an affirmative act of assumption by the trustee
> is required to bring the property into the estate in order to ensure that
> the estate is not charged with the liabilities except upon due
> deliberation.  Thus, executory contracts and leases-unlike all other
> assets-do not vest in the trustee as of the date of the filing of the
> bankruptcy petition.  They vest only upon the trustee's timely and
> affirmative act of assumption.

*Cheadle v. Appleatchee Riders Ass'n (In re Lovitt)*, 757 F.2d 1035, 1041 (9th Cir. 1985) (citations omitted).

*See also*, *Commercial Trading Co. v. Lansburgh (In re Garfinkle)*, 577 F.2d 901, 905, n. 5 (5th Cir. 1978) (citing 4A *Collier on Bankruptcy*, ¶ 70.44); *Fletcher v. Surprise (In re Northern Indiana Oil Co.)*, 180 F.2d 669, 675-76 (7th Cir. 1950) (citing *Collier on Bankruptcy* (14th Ed.); *Reisenwebers, Inc. v. Irving Trust Co. (In re Cigar Stores Co. of America)*, 69 F.2d 513, 515 (2nd Cir. 1934); *Dayton Hydraulic Co. v. Felsenthall*, 116 F. 961, 965 (6th Cir. 1906) (equitable receivership case).

*Frazin* also addressed the Committee's argument regarding the apparent inconsistency

between the vesting language of former Section 70a and the result in *Copeland v. Stephens*.

> It is said, however, that this conclusion is at variance with the express
> provision of the bankruptcy act that all the estate of the bankrupt shall
> vest in the trustee as of the date of the adjudication; that a leasehold

18

interest is property and must necessarily pass with all other property. In our opinion, however, the provisions of the bankruptcy act must be read in view of the principle stated in many decisions and expressly recognized in the English bankruptcy statutes that there is a distinction between property which may be burdensome to an estate and that which is manifestly beneficial to it. The latter, of course, passes upon the adjudication. The former passes only when accepted by the trustee; but, when accepted, the passing of title relates back to the time of the adjudication. If there be no acceptance, however, the title to a burdensome lease never passes. The property which may be said to pass immediately to the trustee in every case is not the lease itself, but the option of accepting it.

183 F. at 32.[33]

Perhaps, as the Committee argues, *Frazin* and the other pre-Code courts should have been more faithful to the specific language of former Section 70a. However, the fact remains that these courts chose instead to adopt *Copeland*'s reasoning, as inconsistent as it may be, that an executory contract or unexpired lease only became property of the estate if the trustee later elected to assume it. The

---

[33]The *Frazin* court, then, was also interpreting whether a recent bankruptcy enactment had or had not changed the historical treatment of leaseholds in a bankruptcy proceeding. However, in *Frazin* the comparison was between the Bankruptcy Act of 1898 and its predecessor, the Bankruptcy Act of 1867. The court observed that the Bankruptcy Act of 1867 was based upon English bankruptcy law, which at that time incorporated the *Copeland* fiction of the leasehold remaining with the bankrupt unless and until the trustee made it part of the estate through its assumption. The court was also quite aware that England had eliminated the *Copeland* fiction from its bankruptcy laws sometime before the Bankruptcy Act of 1898. Nonetheless, *Frazin* concluded that Congress had chosen not to include that change in the 1898 Act but had instead intended to continue what had been the law when Congress passed the 1867 Act.

Interestingly, the *Frazin* court reached this conclusion because of the similarity between the pertinent sections of each act and the fact that Congress had not expressed any intention in 1898 to eliminate what had clearly become part of the 1867 bankruptcy laws - to wit, the *Copeland* fiction. *Compare, Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 779 (1992) ("[T]his Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history"). But then, it is also fair to say that *Frazin* would have come to exactly the opposite conclusion had, for example, Congress said in 1898 what in fact it said in 1978, that the debtor's interest in a leasehold was now to become the estate's property immediately upon the commencement of the case. *See,* H.R. Rep. No. 95-595, at 367 (1978); S. Rep. No. 95-989, at 82 (1978).

consequence of this decision, of course, was that the rest of the pre-Code law concerning executory contracts and unexpired leases was built upon this premise.

There was not, though, strict adherence to all of the outcomes *Copeland* seemed to require. For example, the logical application of *Copeland* would have permitted the landlord to refuse the bankruptcy estate continued possession of the demised premises until the trustee made his postpetition decision to accept the attendant leasehold interest as the estate's own. Nonetheless, the pre-Code courts allowed the trustee to remain in possession pending that decision. As Judge Hand observed to his apparent dismay:

> The power of a trustee in bankruptcy, and of a debtor in reorganization, to withhold leased property pending deliberation, is too well settled for debate. The often considered language in subdivision (b)(10) of section 77B (11 U.S.C.A. § 207(b)(10) presupposes it, and is built upon it, though the debtor must decide within a reasonable time, and the lessor can force it to do so, if it does not.

*Cent. Manhattan Properties v. D.A. Schulte, Inc. of New York*, 91 F.2d 728, 729 (2nd Cir. 1937) (L. Hand, J.)[34]

---

[34]The Second Circuit had earlier come to a similar conclusion with respect to a court appointed receiver's rights in a debtor's leasehold.

> It is the receiver's duty to accept as part of the estate to be administered for the creditors those assets which will prove of value to the estate. Those which are not of value are to be left outside the field of his receivership. As to those assets which are of problematical value, it is necessary that the receiver should be allowed a reasonable time within which to determine to which class of assets they belong, whether they are of the class which he should administer, or to the class which he is to let alone. In order that he may determine, for example, whether he should assume a lease belonging to the insolvent estate, he is entitled to take possession of the leased property and operate it for a reasonable time. By the mere act of taking possession he does not adopt the lease and become bound by its covenants.

The conundrum, then, was how to compensate the landlord for the estate's continued occupancy of the leased property when the fiction created by *Copeland* clearly did not obligate the estate to pay the rent that the debtor had previously agreed upon under the lease. Judge Hand's own solution was to treat the trustee as in effect a holdover tenant. *See, e.g., In re Manhattan Piggly-Wiggly Corp.*, 296 F. 944, 945 (S.D.N.Y. 1923). As such, the trustee could remain in possession of the premises free of charge so long as the landlord did not attempt to evict him. However, if and when the landlord did make the effort, the trustee's choice would be to either remove himself from the property or begin paying rent on whatever terms he and the landlord could agree. Of course, the trustee also had the option of assuming the lease to counter the landlord's demand and, conversely, the landlord could force that decision upon the trustee by persuading the court not to give the trustee any more time to assume or reject the lease. *But, cf. Cent. Manhattan Properties*, 91 F.2d at 729.

Resolving the problem in this fashion was certainly sensible since that is how traditional landlord-tenant law would have treated a person holding possession without there being an actual lease with the property's owner.[35] Judge Hand, though, did not prevail. Rather, the Second Circuit

---

He is entitled to hold for a reasonable time, to ascertain the situation of affairs, and while so holding he is not bound by the covenants of the lease.

*Johnson v. Emerson Phonograph Co., Inc.*, 296 F. 42, 45 (2nd Cir. 1924) (quoting from *Am. Brake Shoe & Foundry Co. v. New York Rys. Co.*, 282 F.523, 528 (2nd Cir. 1922)).

[35]*See, In re Macomb Occupational Health Care, LLC*:

A "tenancy by sufferance" is similar to a tenancy at will in that its term is also indefinite and either party may terminate the tenancy at its discretion. A tenancy by sufferance is distinguished from a tenancy at will by the fact that there is no landlord/tenant relationship between the parties. The occupant of the premises simply holds possession at the "sufferance" of the owner. The common characteristic of all tenancies by sufferance is that the occupant at some prior point in time had the right to possess the premises.

adopted a rule that soon became the law under the former Act and that still is cited again and again by modern courts - that while a landlord could not recover the agreed upon rent from the estate unless and until it actually became a party to the underlying lease through the trustee's postpetition acceptance/assumption of the same, the landlord was nonetheless entitled as a matter of equity to recover a reasonable rent from the estate for its use of the premises during the interval given for the trustee to make that decision.

For example, in the oft-cited case of *United Cigar*,[36] the landlord contended that the estate owed it rent for the entire building the debtor had leased even though the trustee's continued occupancy of the premises prior to his ultimate decision not to assume the lease had been limited to a much smaller space. The panel, which coincidently included Judge Hand's less famous cousin, Augustus, disagreed, and instead awarded the landlord only a reasonable rent based upon the estate's actual use. Relying upon the *Copeland* fiction, it reasoned:

> The prior right to possession must have also arisen by agreement, not as a matter of law.
>
> * * *
>
> [T]he law in Michigan is that an owner of land may not recover rent from its occupant unless there is an agreement between the parties to treat their relationship as that of a landlord and tenant. Consequently, the law in Michigan is also that an owner of land subject to a tenancy by sufferance, which by definition is not based upon a landlord/tenant relationship, may not recover rent from an occupant holding possession pursuant to the tenancy. *Hogsett v. Ellis*, 17 Mich. 351 (1868). The courts have logically concluded that an owner has no one to blame but itself for allowing a tenant by sufferance to occupy its land rent-free. If the owner wanted relief, then it had only to "suffer" the occupant's possession no more by evicting the unwanted tenant.

300 B.R. 270, 285-86 (Bankr. E.D. Mich. 2003) (Hughes, J.) (footnote omitted).

[36] *Reisenwebers, Inc. v. Irving Trust Co. (United Cigar Stores Co. of Am.)*, 69 F.2d 513 (2nd Cir. 1934).

22

> Neither chancery receivers nor trustees in bankruptcy are automatically vested with the title to leaseholds belonging to an insolvent. They take title to a lease only in case they conclude that acceptance is advantageous to the estate and elect to adopt the lease within a reasonable time. If they do so elect, the title relates back to the date of the filing of the bill or petition. So far as they go into occupation of leased premises without adopting the lease, the landlord has a right to compensation for use and occupation out of funds in their hands. **It is an equitable right based upon the reasonable value of the use and occupation.**

*United Cigar*, 69 F.2d at 515(emphasis added and citations omitted).[37]

---

[37]Modern cases that have cited *United Cigar* as authority include *In re Rhymes*, 14 B.R 807, 808 (Bank. D. Conn. 1981); *Gwinnett Prado, L.P. v. Rhodes, Inc. (In re Rhodes, Inc.)*, 321 B.R. 80, 91 (Bankr. N.D. Ga. 2005); *In re Curry Printers, Inc.*, 135 B.R. 564, 580 (Bankr. N.D. Ind. 1991); *In re Xonics, Inc.*, 65 B.R. 69, 73 (Bankr. N.D. Ill. 1986); *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 102 (Bankr. S.D.N.Y. 1998); *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 882 (Bankr. E.D.N.Y. 1986); and *In re Longua*, 58 B.R. 503, 504 (Bankr. W.D. Wis. 1986).

*American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, a subsequent Second Circuit case, also relied upon *United Cigar* when it said:

> The right to priority in the event the trustee or debtor in possession receives benefits under the contract *during the interval between the filing of the debtor's petition and the rejection of the contract* 'is an equitable right based upon the reasonable value' of the benefits conferred, rather than upon the contract price. *In re United Cigar Stores Co.*, 2 Cir., 69 F.2d 513, 515 ... .

280 F.2d 119, 125 (2nd Cir. 1960).

*American Anthracite*, of course, is not a Code case. Nonetheless, it is this particular passage from *American Anthracite* that modern courts often cite as their justification for limiting administrative rent to only a reasonable amount. *See, e.g., In re Kent Holland Die Casting & Plating, Inc.*, 125 B.R. 493, 502 (Bankr. W.D. Mich. 1991); *In re Hooker Invs., Inc.*, 145 B.R. 138, 145 (Bankr. S.D.N.Y. 1992); *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. 606, 610 (N.D. Ga. 1985); *Kinnan & Kinnan P'ship v. Agristor Leasing*, 116 B.R. 162, 166 (D. Neb. 1990); *Peninsula Gunite*, 24 B.R. at 595; *Peoples Gas System, Inc. v. Thatcher Glass Corp. (In re Thatcher Glass Corp.)*, 59 B.R. 797, 799 (Bankr. D. Conn. 1986); *Case Credit Corp. v. Baldwin Rental Centers, Inc. (In re Baldwin Rental Centers, Inc.)*, 228 B.R. 504, 513 (Bankr. S.D. Ga. 1998); *In re Bridgeport Plumbing Products, Inc.*, 178 B.R. 563, 565 (Bankr. M.D. Ga. 1994); *In re Carmichael*, 109 B.R. 849, 851 (Bankr. N.D. Ill. 1990); *In re Curry Printers, Inc.*, 135 B.R. 564, 579 (Bankr. N.D. Ind. 1991); *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.)*, 163 B.R. 899, 908 (Bankr. D. Mass. 1994); *In re Spectrum Info. Technologies, Inc.*, 193 B.R. 400, 407 (Bankr. E.D.N.Y. 1996); *In re Ram Mfg. Inc.*, 38 B.R. 252, 254 (Bankr. E.D. Pa. 1984).

23

*See also, In re Sherwoods, Inc.*, 210 F. 754, 757 (2nd Cir. 1913); *Brown v. Danning (In re Frederick Meats, Inc.)*, 483 F.2d 951, 952 (9th Cir. 1973); *120 Wall Associates v. Schilling*, 266 F.2d 548, 550 (2nd Cir. 1959).

The legal soundness of this rule, as well as the corollary rule that the lease's assumption would "relate back" to the commencement of the case so as to make the estate then accountable for all of the postpetition actual rent incurred, was questioned even under the former Act. *See, e.g., Palmer v. Palmer*, 104 F.2d 161, 163.[38] However, whatever dispute there may have been has now been resolved through the Bankruptcy Code's effective elimination of the *Copeland* fiction. But with this change in the law must also come the consequence that seemed so obvious to Judge Hand years ago in *Palmer* - that the estate, as the successor tenant, must also "fulfill the conditions imposed upon the [lease's] term," including the payment of the agreed upon rent, should the estate "hold the premises even temporarily," for that is the essence of "property *cum onere*." 104 F.2d at 163.[39]

---

[38]Judge Hand expressed in *Piggly-Wiggly* even stronger doubts about the award of administrative rent in the absence of privity between the estate and the landlord:

> When the possession of the premises passes to a receiver, the lessor must take some action, or agree with the receiver; else he consents to the status quo. Indeed, the receiver was under no obligation to pay the December rent, and would be properly surcharged with it in his accounts. It has indeed been the custom for receivers to pay rent without any agreement, or any proceedings taken by the lessor; but the practice is a loose one, and cannot justify disregarding the well-fixed rights of the parties when they insist upon them.

296 F. at 945.

[39]Interestingly, *Palmer* is frequently cited by modern courts as yet another Act case supporting the proposition that the administrative rent to be awarded in connection with a rejected lease is to be limited to only the benefit realized by the estate. *See, e.g., In re GHR Energy Corp.*, 41 B.R. 668, 670 (Bankr. D. Mass. 1984); *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 934 (Bankr. W.D. Tex. 1994). However, while Judge Hand did concede in *Palmer* that the recognized law was just as he had described it, he did so only reluctantly. Indeed, he followed his concession with this musing:

> Be that as it may, the trustee need not pay the rent during the probationary period, and the court will hold off the lessor, and force him to be content

24

     (c)     <u>Early Bankruptcy Code Authority</u>

As already mentioned, cases decided under the Bankruptcy Code have adopted the former Act rule of limiting administrative rent on a rejected lease to only a reasonable value by either citing former Act decisions directly or citing more current decisions that in turn derive their authority from pre-Code cases. Not surprisingly, many of these decisions were rendered when the Bankruptcy Code was still relatively new and memories of what had been the rule under the former Act were still fresh. For example, in the early case of *In re Rhymes*, the court declared:

> With respect to unexpired leases, it is well settled that until assumption or rejection of the debtor's lease, the estate is liable only for the reasonable value of the use and occupancy of the property. *In re United Cigar Stores Co.*, 69 F.2d 513 (2d Cir.), cert. denied sub nom. *Reisenwebers, Inc. v. Irving Trust Co.*, 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934); *In re Standard Furniture Co.*, 3 B.R. 527, 6 B.C.D. 270 (Bkrtcy.S.D.Cal.1980); 2 Collier on Bankruptcy Par. 365.03(2) (15th ed. 1979); See 3 Collier on Bankruptcy Par. 503.04(1)(a) (15th ed. 1979). The liability for actual use and occupancy is based on "the equitable principle of preventing unjust enrichment, rather than the compensation of the creditor for loss to him." *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 126 (2d Cir. 1960).

14 B.R. 807, 808 (Bankr. D. Conn. 1981) (emphasis added).

---

> with the value of the use and occupation meanwhile, though ordinarily it will fix that at the same amount as the rent. This was the result in *Quincy, etc., R. Co. v. Humphreys*, 145 U.S. 82, 12 S.Ct. 787, 36 L.Ed. 632, and in *United States Trust Co. v. Wabash Railway*, 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085, though so many other circumstances were thought relevant that we are not clear as to the precise scope of either ruling. But we have ourselves a number of times declared that the trustee's title 'relates back', or that he is liable only for use and occupation, and in some instances what we said was necessary to the result. Whether justified in principle or not, the doctrine has by now become too well fixed to be uprooted, especially since no change was made when the whole subject was overhauled in the Chandler Act.

*Id.*

25

And in the even earlier case of *In re Standard Furniture Co.*, the court said this:

> It is well settled, however, that where a lease is ultimately rejected, or for the period pending either rejection or assumption, the amount of allowable expense for administrative rent is measured by the period of actual occupation and use of the premises. See *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174, 61 S.Ct. 538, 541, 85 L.Ed. 651 (1941) (reorganization case); *Matter of Chase Commissary Corporation, supra*, 11 F.Supp. at 289; *In re CRS Architectural Metals Corp.*, 1 B.R. 729, 732 (E.N.Y.1979).

3 B.R. 527, 530 (Bankr. D. Cal. 1980).

Unfortunately, these cases, like *United Cigar*, figured prominently in the later decisions of other courts as they too were called upon to address the issue.  For example, in *GATX Leasing Corp. v. Airlift Int'l Inc. (In re Airlift Int'l Inc.)*, the Eleventh Circuit said:

> Where the debtor is a lessee, the estate is liable for the reasonable value of the use and occupancy of the property during the period between filing and assumption or rejection of the unexpired lease. *See In re Rhymes, Inc.*, **14 B.R. 807, 808 (Bkrtcy.D.Conn.1981)**; 2 *Collier on Bankruptcy*, ¶ 365.03 [2] (15th ed. 1979).

761 F.2d 1503, 1508 (11th Cir. 1985) (emphasis added).

And in *Braniff Airways*, the Fifth Circuit said:

> If the trustee assumes the lease, the debtor's estate becomes liable for the full rent accruing under the terms of the lease. *In re Florida Airlines, Inc.*, 17 Bankr. 683, 684 (Bankr.M.D.Fla.1982). If the trustee ultimately rejects the lease the debtor's estate is liable only for the reasonable value of its use and occupancy of the premises. The lessor is entitled to receive administrative expense priority for that amount (*see* §§ 503 and 507(a)(1) of the Bankruptcy Code) which is ordinarily presumed to be the contract rental rate, adjusted downward or upward to reflect the extent to which the debtor actually used the demised premises. *In re Energy Resources Co., Inc.*, 47 B.R. 337, 338-39 (Bankr.D.Mass.1985); *Dallas-Fort Worth Regional Airport Board v. Braniff Airways, Inc.*, 26 B.R. 628, 630-31 (N.D.Tex.1982) [hereinafter cited as *DFW Regional Airport Board* ]; *In re Standard Furniture Company*, **3 B.R. 527, 530 (Bankr.S.D.Cal.1980)**; *see*

26

*generally* Fogel, Executory Contracts and Unexpired Leases in the Bankruptcy Code, 64 Minn.L.Rev. 341, 365-71 (1980).

*In re Braniff Airways*, 783 F.2d at 1285-86 (emphasis added).[40]

(d)    *Fred Sanders Company*

Indeed, of the myriad opinions written since the Code's enactment, only *In re Fred Sanders Company*, 22 B.R. 902 (Bankr. E.D. Mich. 1982), actually recognized that the former Act's approach to unexpired leases had changed. *Sanders* involved three vans that had remained in the bankruptcy estate's possession for almost a year before their underlying leases were finally rejected. Fruehauf Corporation, the lessor, then filed an administrative claim for the postpetition rent due on the vans. However, the debtor-in-possession objected, contending instead that nothing was owed as administrative rent because it had not used the vans since the commencement of the case.

Unlike the other courts, the *Sanders* court both understood why pre-Code cases like *United Cigar* had awarded reasonable rent as opposed to the agreed upon rent:

> In cases involving equity receiverships, courts maintained that since a receiver was not in privity of contract with the lessor, he did not "become liable on existing leases merely by appointment or temporary

---

[40]*See also, In re Dixie Fuels, Inc.*, 52 B.R. 26, 27 (Bankr. N.D. Ala. 1985); *In re Bridgeport Plumbing Products, Inc.*, 178 B.R. at 565; *In re Mr. Gatti's, Inc.*, 164 B.R. at 934; *In re GHR Energy Corp.*, 41 B.R. at 670; *Varon v. Trimble, Marshall & Goldman, P.C. (In re Euro-Swiss Int'l Corp.)*, 33 B.R. 872, 888 (Bankr. S.D.N.Y. 1983); *In re Int'l Storage Corp.*, 41 B.R. 808, 809 (Bankr. E.D. Wis. 1984); *In re Gamma Fishing Co., Inc.*, 70 B.R. 949, 954 (Bankr. S.D. Cal. 1987); *In re Woods Farmers Coop. Elevator Co.*, 107 B.R. 694, 697 (Bankr. D. N.D. 1989); *In re Glinz*, 1985 WL 660825 at *6 (Bankr. D. N.D. 1985); *TN Commc'ns Corp. v. Adwar Video Corp. (In re Adwar Video Corp.)*, 38 B.R. 628, 629 (Bankr. S.D.N.Y. 1984); *In re Gourmet Gallery, Inc.*, 27 B.R. 912, 914 (Bankr. E.D. Pa. 1983); *In re Florida Airlines, Inc.*, 17 B.R. 683, 685 (Bankr. M.D. Fla. 1982); *In re Lackow Bros. Inc.*, 18 B.R. 770, 772 (Bankr. S.D. Fla. 1982); *In re Phar-Mor, Inc.*, 290 B.R. 319, 322 (Bankr. N.D. Ohio 2003); *In re Grimm & Rothwell, Inc.*, 108 B.R. 186, 190 (Bankr. S.D. Ohio 1989); *In re Tucci*, 47 B.R. 328, 333 (Bankr. E.D. Va. 1985); *Dallas-Fort Worth Reg'l Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 631 (N.D. Tex. 1982); *In re Cole*, 189 B.R. 40, 48 (Bankr. S.D.N.Y. 1995); *In re Sweetwater*, 40 B.R. 733, 745 (Bankr. D. Utah 1984); *Harris Int'l Telecomms., Inc. v. Three Star Telecast, Inc. (In re Three Star Telecast, Inc.)*, 73 B.R. 270, 274 (Bankr. D. P.R. 1987).

> occupation." *In re Chase Commissary Corp.*, 11 F.Supp. 288, 289 (S.D.N.Y. 1935); Pomeroy, Equity Jurisprudence s 1624 (4th Ed. 1919). He became liable on the lease only if he adopted the lease. *In re United Cigar Stores Co.*, 69 F.2d 513 (2d Cir. 1934).

*Id.* at 903.

and, equally important, why that reason no longer existed under the newly enacted Bankruptcy Code:

> There is no need to resort to the fiction of delayed vesting under the Code to reach the result that a trustee is not bound by an existing lease until he affirmatively adopts the lease. The debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the estate." s 541. The legislative history states that the "debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or a leasehold interest." Clearly, therefore, upon the filing of the bankruptcy petition, a lease becomes property of the estate.

*Id.* at 904 (citations omitted).

But the *Sanders* court did not consider this change as having a material affect upon the *United Cigar* approach to awarding administrative rent:

> Section 541, however, must be read in conjunction with section 365(a), which provides that the debtor may assume or reject any existing lease. The right to assume presupposes that assumption does not automatically take place upon the filing of the bankruptcy petition, and the right to reject presumes the existence of something which can be rejected. The apparent conflict between section 541 and section 365 is readily reconcilable. A lease has two aspects-the lessee's right to possession and use, and his correlative obligation to make the agreed-upon lease payments. The debtor lessee's right to possession and use of the leased property becomes part of the estate. The debtor, however, is not liable for the payments provided for under the lease until the lease is assumed. Until the lease is assumed, the estate is liable only for the reasonable value of the leased property-the same obligation which existed under equity receiverships and the Bankruptcy Act. 2 Collier Bankr. P 365.03(2) (15th ed. 1982).

*Id.* at 904-5.

The deficiency in *Sanders*' reasoning, though, is its attempt to reconcile Sections 541 and 365 with respect to the question of administrative rent when in fact no reconciliation is required. Indeed, *Sanders* itself acknowledges that among all the rules that Section 365 now provides for the estate's administration of executory contracts and unexpired leases, none can be found that addresses the "reasonable value" question.

> Section 365 sets forth detailed rules for the treatment of executory contracts and unexpired leases. Unfortunately, however, it does not address the "reasonable value" question.

*Id.* at 905, n. 7.

In addition, *Sanders*' dissection of the leasehold acquired by the estate into a possessory right and a separate obligation to pay rent not only lacks any supporting citation but also is contrary to the rule that the Supreme Court had enunciated only three years earlier in *Butner*[41] and that Congress had again declared in connection with the just as recently enacted Bankruptcy Code[42] - that the estate cannot acquire greater rights in property than what the debtor himself enjoyed. Consequently, *Sanders*' "reconciliation" leaves unanswered the crucial question raised by Judge Hand in *Palmer* - how can the bankruptcy estate for a moment claim the right of possession under a lease without also honoring the same terms as had the debtor prior to the case's commencement? 104 F.2d at 163. Granted, as will be shown, the automatic stay will permit the estate's continued possession notwithstanding the estate's failure to actually pay the corresponding rent as it comes due. However,

---

[41]440 U.S. 48, 99 S.Ct. 914 (1979).

[42]H.R. Rep. No. 95-595, at 367-68 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323; S. Rep. No. 95-989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868.

neither the automatic stay, nor for that matter Section 365, is capable of exonerating the estate from ultimately having to account for the postpetition rent that nonetheless accrued.

*Sanders* creates other analytical challenges as well. For example, if, as *Sanders* concludes, the demised premises are "separated" from the attendant obligation to pay rent until the lease is assumed, then it is reasonable to ask why the estate should pay any rent at all during this interval if the lease is ultimately rejected. In other words, why should this "separate" property be administered differently than any other property that is not subject to an encumbrance? As for the lease's "detached" liability, it seems equally clear under the *Sanders*' construct that the landlord's recourse at most would be its right to compel the trustee to make his decision to assume or reject the underlying lease sooner than he might otherwise choose.

And finally, *Sanders* lacks historical perspective, for it ignores the very reason why the pre-Code courts awarded lessors only reasonable rent in the first place. Again, as *Sanders* itself recognized, the delayed vesting of a lease under the *Copeland* fiction left the lessor with no recourse against the estate for rent since the estate was not in privity unless and until the lease was ultimately assumed. *Id.* at 903. Therefore, *United Cigar* and other pre-Code courts utilized their equitable powers to at least award the lessor a reasonable rent for the estate's continued enjoyment of the subject property while the decision to assume the lease or not was being made. But, as *Sanders* should have realized, this equitable reason disappeared with the Code's enactment, for its elimination of the *Copeland* fiction meant that the estate would in fact be in privity with the lessor from the very outset of the case. Indeed, it is difficult to understand why *Sanders* did not comprehend that the estate's immediate privity with the lessor placed into question its own unsupported conclusion that

30

only a reasonable rent was due, for *Sanders* also quoted this from a much earlier Sixth Circuit decision.

> A court of equity will not suffer an injustice to be done a lessor by acts or conduct which amount equitably to an exclusion of the lessor from the premises, and an appropriation of them to the supposed benefit of the trust.

*Dayton Hydraulic Co.*, 116 F. at 966.

That citation then was followed by *Sanders'* own much more memorable observation:

> The view that the estate should be liable only for the debtor's actual use or occupancy is based, in part at least, upon the premise that expenses of administration are to be minimized. **The desire to keep a lid on expenses of administration is laudable, but an estate is not to be maintained for the debtor or creditors at the expense of those who have valid charges against property of the estate.**

*Id.* at 906 (emphasis added).

But if "what is sauce for the goose is sauce for the gander," it would certainly seem that *Sanders'* admonition is equally applicable to its own conclusion that only a reasonable rent is owed given the Code's elimination of the *Copeland* fiction and the resulting privity that now immediately exists between the lessor and the bankruptcy estate.

>     (e)    *Broadfoot* and *Templeton*

*Sanders* prompted a considerable debate among the courts over the allowance of administrative rent under the Code. That debate, though, was not what this court would have expected. Rather, it was over whether the rent awarded should always be the property's fair rental value, which is what *Sanders* ultimately held, or whether it should it be further limited to only the debtor's actual postpetition use of the same. For example, this is how the court in *In re Templeton* described the ensuing discussion:

31

> There are two lines of cases regarding the granting of administrative priority status to post-petition rents to the rejection of an unexpired lease. One line of cases holds that a creditor may be granted an administrative priority expense for post-petition rental claims even where the estate does not benefit from the possession of the creditor's property. The other line of cases, adopted by this court, requires that the bankruptcy estate must benefit from the use of the creditor's property to be granted an administrative priority claim.

154 B.R. 930, 932 (Bankr. W.D. Tex. 1993) (citations omitted).[43]

*Broadcast Corp. of Georgia v. Broadfoot* is generally regarded as the seminal case rejecting the *Sanders* approach. 54 B.R. 606 (N.D. Ga. 1985) ("*Broadfoot I*"), *aff'd sub nom Subscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir. 1986) ("*Broadfoot II*"). Not surprisingly, *Broadfoot I* begins with its own misplaced citation to pre-Code case authority.

> It is well established that once an executory contract or lease is rejected, the creditor may file an administrative claim for the "reasonable value of the use or occupation" by the trustee of the creditor's assets during the time before rejection.

*Id.* at 609 (citations omitted).[44]

Ignored by both appellate courts, though, is what only *Sanders* among all of the courts correctly realized - that the enactment of the Bankruptcy Code had eliminated the very reason for this rule to have been established.

---

[43]*See also, In re Mohawk Indus., Inc.*, 54 B.R. 409, 411-12 (Bankr. D. Mass. 1985).

[44]Of the six cases *Broadfoot I* cites for this proposition, three are actually Act cases - *Dipple*, 312 U.S. 168; *Palmer*, 104 F.2d 161; *Cochise College Park*, 703 F.2d 1339. As for the other three, *Rhymes*, 14 B.R. 807, *GHR Energy Corp.*, 41 B.R. 668, and *In re By-Rite Distrib., Inc.*, 47 B.R. 660 (Bankr. D. Utah 1985), these cases either themselves cite Act cases or cite Code cases that in turn rely upon Act cases.

Moreover, *Broadfoot* involved an executory contract, not an unexpired lease.[45] The debtor there offered a subscription television service that required Broadcast to transmit the debtor's scrambled signal to the debtor's subscribers during certain hours of each day. The debtor utilized this service during the entire course of its aborted Chapter 11 case and the Chapter 7 trustee also utilized it for seventeen days once the case was converted. The Chapter 7 trustee, though, never actually rejected the contract and, as a consequence, the contract was not "deemed" rejected until the sixtieth day from conversion. *See*, 11 U.S.C. §§ 365(d)(1) and 348(a). Consequently, Broadcast contended that it was entitled to reimbursement for the entire sixty days because its contract with the debtor prohibited it from offering the signal to anyone else as long as the contract remained in effect. The Chapter 7 trustee, of course, asserted that the estate should be charged for only the seventeen days the signal was actually used.

Although the bankruptcy court agreed with Broadcast, both the district court and the Eleventh Circuit found for the Chapter 7 trustee on appeal. In arriving at this conclusion, both appellate courts relied heavily upon the fact that Broadcast had not provided any benefit to the estate for the forty-three day interval between when the Chapter 7 trustee actually stopped using Broadcasts' services and when the executory contract was finally deemed rejected.

---

[45]    The court therefore finds that the mere failure by a Chapter 7 trustee to reject or assume an executory contract during the 60-day period is not a use for which the nondebtor contracting party is entitled to priority compensation.

*Id.* at 612.

33

> As the district court held, ... "there must be an actual, concrete benefit to the estate before a claim is allowable ..." as an administrative expense. *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. at 613.

*Broadfoot II*, 789 F.2d at 1532.[46]

However, this court submits that both *Broadfoot I* and *II* could have arrived at the same conclusion without glossing the "actual" and "necessary" language of Section 503(b)(1)(A) with the addition of "benefit." Think of it this way. The bankruptcy estate's right in *Broadfoot* to demand that Broadcast provide the signal under the executory contract was the only "property" that became part of the estate, and therefore it was only that right that might need to be preserved for the estate. That right in turn was reinforced with the estate's ability, again as the debtor's assignee, to sue Broadcast for damages, and perhaps even specific performance, if Broadcast refused without justification.

Consider, then, whether Broadcast did anything during the remaining forty-three days before the contract was finally deemed rejected that could be recognized as either actual or necessary for the preservation of that right and accompanying remedy. Granted, Broadcast may have, as it claimed, forgone during this interval an opportunity to provide the same signal to another customer and, as a consequence, suffered damages. However, from the estate's perspective, whether Broadcast had or

---

[46]What the district court had previously held is this:

> First, the *Sanders* Rule is contrary to the relevant statutory description of administrative expenses. 11 U.S.C. § 503(b)(1)(A) provides that such expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case...." The use of the words "actual" and "necessary" indicate that the estate must accrue a real benefit from the transaction for which the claim is being filed. The mere potential of benefit to the estate does not satisfy this requirement. *In Re Kessler*, 23 B.R. 722, 724 (Bkcy.S.D.N.Y.1982).

*Broadfoot I*, 54 B.R. at 611.

had not done so would have made no difference since the estate would still have preserved the right during that forty-three days to demand the use of that signal upon the threat of a lawsuit if Broadcast refused. Or, to put it differently, Broadcast had done nothing during the remaining forty-three day interval that was either actual or necessary to the preservation of the estate's right under that executory contract to demand the resumption of the promised services, either with or without the assistance of Section 365(b)(1). Therefore, Broadcast was not entitled to priority treatment for what ultimately became only part of Broadcast's Section 502(g)(1) prepetition rejection claim.[47]

But, as has already been established, an unexpired lease is not an executory contract and, as such, what is actual and necessary for the preservation of one is not necessarily what is actual and necessary for the preservation of the other. In other words, while the Chapter 7 trustee in *Broadfoot* did not have to pay anything in the interim to the broadcaster in order to preserve the estate's rights to later demand the resumption of service under the executory contract involved there, the payment of rent is in fact absolutely necessary if the estate's possession of the demised property is to be preserved under an unexpired lease, which is the case here. Again, as Judge Hand said:

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry.

*Palmer*, 104 F.2d at 163.

---

[47]Of course, the chance that the Chapter 7 trustee might call upon Broadcast to once again perform under the contract would have disappeared when it finally was deemed rejected on the sixtieth day. Broadcast could have also avoided the uncertainty of the remaining forty-three days had it been able to compel the contract's rejection during the prior Chapter 11 proceeding. 11 U.S.C. § 365(d)(2).

Unfortunately, the courts that have since extended *Broadfoot I* and *II* to cases involving unexpired leases have not appreciated this distinction. Take, for example, *In re Templeton*, which involved a Chapter 12 farmer's lease of a tractor and plow from the bank.[48] The bankruptcy court in that case refused the bank any administrative rent for the postpetition period prior to the lease's rejection on the basis that the debtor had not used the equipment during that interval. In rejecting *Sanders* and adopting *Broadfoot*, the *Templeton* court concluded that *Sanders* ran "afoul" of the plain meaning of Section 503(b)(1)(A):

> The Supreme Court has recently noted that bankruptcy courts should interpret the Bankruptcy Code with a view to enforcing the statute's plain meaning. A plain reading of section 503(b)(1)(A) indicates that expenses must be "actual and necessary" to be allowed as administrative expenses. Courts have concluded that the use of the words "actual and necessary" in the administrative priority section requires that there must be a real benefit to the estate from the transaction.

*Id.* at 933-34 (citations omitted).

> *Templeton* then quoted this passage from *In re Carmichael*:

> The language of § 503 continues the longstanding rule under the former Bankruptcy Act that a creditor's right to payment will be afforded priority only to the extent the estate was benefited in fact from the consideration supporting the creditor's claim. *See, American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2nd Cir.1960); *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976).

109 B.R. at 851.

However, with all due respect, it is *Templeton* and, for that matter, *Carmichael* that run afoul of Section 503(b)(1)(A), for each restricts the "actual" and "necessary" requirements of that section

---

[48]154 B.R. at 932.

with the further judicially imposed requirement that the subject expense be of some "real benefit" to the estate. Courts, though, are not empowered to embellish what Congress has written. For example, in *Lamie v. United States Trustee*, the Supreme Court itself refused to add language to Section 330(a) even though it appeared there that Congress had erred in drafting that section.

> Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding. It results from "deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill."

540 U.S. 526, 538, 124 S.Ct. 1023, 1032 (2004) (citations omitted).

It stands to reason then, that the Court would be even less amenable to adding language to a section that is not so handicapped, as is the case here.

Moreover, *Templeton* and *Carmichael* create the false impression that Section 503(b)(1)(A) is nothing more than a codification of *American Anthracite* and the reference therein to benefit having to be conferred upon the estate. However, the former Bankruptcy Act had its own section concerning the allowance of administrative expenses which was almost identical to Section 503(b)(1)(A).

> The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition: . . .

Former Section 64a(1), 11 U.S.C. § 104 (repealed).

Consequently, it is fair to assume that if "benefit" is to now be read into Section 503(b)(1)(A), and if *American Anthracite* is the authority for that interpretation, then *American Anthracite* would have interpreted former Section 64a(1) in exactly the same manner. That is, *American Anthracite* itself would have said "[t]he use of the words 'actual' and 'necessary' [in former Section 64a(1)] indicate

37

that the estate must accrue a real benefit from the transaction for which the claim is being filed," just

as the district court had done in *Broadfoot I*. 54 B.R. at 611. But, *American Anthracite* does not offer

that analysis. Rather, its conclusion concerning benefit as being a prerequisite to administrative

priority derives entirely from *United Cigar* and the equitable remedy that that earlier case had created

to address the peculiar problem of administrative rent under the former Act.

> The right to priority in the event the trustee or debtor in possession
> receives benefits under the contract during the interval between the
> filing of the debtor's petition and the rejection of the contract 'is an
> equitable right based upon the reasonable value' of the benefits
> conferred, rather than upon the contract price.

*American Anthracite*, 280 F.2d at 124.

And *American Anthracite* again cites *United Cigar* for this proposition.

> These principles have most often been applied by the courts with
> respect to leases of real property. In such cases it is said that, unless
> the trustee or debtor in possession elects to assume the duties of the
> bankrupt lessee under the lease, he is liable only for actual use and
> occupancy of the property.

*Id.* at 125.[49]

Put simply, *Templeton* and *Carmichael* cannot reshape *American Anthracite* and similar pre-

Code cases to justify what they now want to read into Section 503(b)(1)(A). Rather, the

"longstanding rule" these cases supposedly establish is in fact an anachronism of a former era that

was compelled by a legal fiction that no longer exists. Indeed, it is ironic that the modern courts have

---

[49]Granted, *American Anthracite* does then extend the reasoning in *United Cigar* from just "contracts for the lease of real property" to "other kinds of contracts." *Id.* However, that extension cannot be read as a broadening of former Section 64(a)(1). Rather, it is nothing more than the Second Circuit's recognition that other parties might also need the equitable remedy it had previously provided to landlords in *United Cigar*. Indeed, *American Anthracite* justified its expansive reading of *United Cigar* with the observation that "priority has in fact been accorded to claims for use by the trustee of personal property leased to the bankrupt." *Id.* (citing *Mathews v. Butte Mach. Co.*, 286 F. 801 (9th Cir. 1923)).

relied so heavily on *American Anthracite* as justification for limiting administrative rent and even denying it altogether when *American Anthracite* in fact refers to equitable principles used back then to ensure that the landlord would receive at least something as administrative rent when the prevailing law at that time otherwise said that the landlord should receive nothing.

3.    The Bankruptcy Code

Although Judge Hand's reasoning in *Palmer* leads to the inescapable conclusion that the modern bankruptcy estate, as the immediate successor to the debtor's burdened rights under an unexpired lease, is obligated to pay the actual rent as it continues to come due under that lease, the concept that underlies that conclusion - i.e., a neutral transfer of the leasehold from the debtor to the estate - is itself qualified by whatever the Bankruptcy Code might otherwise provide. *See, e.g., Butner v. U.S.*, 440 U.S. at 54, 99 S.Ct. at 918. Consequently, the Committee's position is still salvageable if, as it maintains, a specific provision of the Bankruptcy Code itself requires Fifth Third's administrative rent to be pared down from whatever otherwise it is owed as postpetition rent under the lease with Debtor.

(a)    The Automatic Stay and Section 365(d)(5)

There is no question that the Code gives the bankruptcy estate rights against the lessor beyond those provided under the lease itself. Perhaps the most obvious of these rights is the estate's ability to remain in possession notwithstanding an underlying default in either the payment of rent or some other obligation. It is, of course, tempting to think of Section 365 as itself affording this additional protection. However, as already explained, that section speaks only to how the estate can eliminate that default in the event the trustee elects to assume the lease and continue enjoying the exclusive possession of the property it involves. *Cf.* 11 U.S.C. § 365(b).

39